No. 22-3285

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT
————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALFREDO VIVEROS-CHAVEZ,

*Defendant-Appellant.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

D.C. No. 1:21-CR-00665-1
HONORABLE MATTHEW F. KENNELLY

————————————

## BRIEF OF *AMICI CURIAE* ADVOCATES FOR BASIC LEGAL EQUALITY, JUSTICE STRATEGIES, LATINOJUSTICE PRLDEF, LEGAL AID JUSTICE CENTER, MASSACHUSETTS LAW REFORM INSTITUTE, AND NATIONAL IMMIGRATION LAW CENTER IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

————————————

Max S. Wolson
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
(202) 216-0261 • wolson@nilc.org

Nicholas David Espiritu
National Immigration Law Center
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
(213) 639-3900 • espiritu@nilc.org

LatinoJustice PRLDEF
Miranda Galindo
523 W. Colonial Drive
Orlando, FL 32804
(321) 250-2853
mgalindo@latinojustice.org

*Attorneys for Amici Curiae*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3285

Short Caption: United States v. Alfredo Viveros-Chavez

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Advocates for Basic Legal Equality, Justice Strategies, LatinoJustice PRLDEF, Legal Aid Justice Center,

 Massachusetts Law Reform Institute, National Immigration Law Center

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 LatinoJustice PRLDEF, National Immigration Law Center

(3)    If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

          no amicus organization has a parent corporation

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          no amicus organization issues stock

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Max S. Wolson                    Date: 02/21/2023

Attorney's Printed Name: Max S. Wolson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address: P.O. Box 34573

 Washington, D.C. 20043

Phone Number: (202) 216-0261                    Fax Number: (202) 216-0266

E-Mail Address: Wolson@NILC.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3285

Short Caption: United States v. Alfredo Viveros-Chavez

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Advocates for Basic Legal Equality, Justice Strategies, LatinoJustice PRLDEF, Legal Aid Justice Center,

    Massachusetts Law Reform Institute, National Immigration Law Center

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    LatinoJustice PRLDEF, National Immigration Law Center

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        no amicus organization has a parent corporation

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        no amicus organization issues stock

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Nicholas David Espiritu    Date: 02/21/2023

Attorney's Printed Name: Nicholas David Espiritu

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: 3450 Wilshire Blvd., No. 108-62

    Los Angeles, CA 90010

Phone Number: (213) 639-3900    Fax Number: (213) 639-3911

E-Mail Address: espiritu@nilc.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................... i

TABLE OF AUTHORITIES ..................................................... ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................1

ARGUMENT .......................................................................6

   A.  Neither Federal Law nor the Sentencing Guidelines Require Incarceration for Section 1326 Convictions.......................................................... 6

   B.  Individuals Convicted of Violating Section 1326 are Almost Exclusively Latino and are more likely to be Sentenced to a Term of Incarceration than Similarly Situated Individuals. ...................................................... 9

   C.  The Disproportionate Conviction of Latinos Under Section 1326 Leads to Extremely Punitive Results. ....................................................... 13

   D.  Section 1326 Reinforces Stereotypes of Latinos as Criminals ........................ 18

     1.  Those Convicted Under Section 1326 are Designated as "Criminal Aliens" and Falsely Portrayed as Dangerous ...........................................18

     2.  Local Law Enforcement Relies on the "Criminal Alien" Designation to Racially Profile Latinos......................................................................20

     3.  Racial Profiling Encouraged by the "Criminal Alien" Designation Drives the Racial Disparity in Section 1326 Convictions. ...................................25

CONCLUSION ....................................................................28

CERTIFICATE OF COMPLIANCE ........................................................29

CERTIFICATE OF SERVICE ...........................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Commonwealth v. Hilaire,*
  437 Mass. 809 (2002) ....................................................................3

*Fong Yue Ting v. United States,*
  149 U.S. 698 (1893) .....................................................................17

*Gomillion v. Lightfoot,*
  364 U.S. 339 (1960) .....................................................................13

*Guinn v. United States,*
  238 U.S. 347 (1915) .....................................................................13

*Lane v. Wilson,*
  307 U.S. 268 (1939) .....................................................................13

*Lee v. United States,*
  137 S. Ct. 1958 (2017) .................................................................17

*Lopez-Flores v. Douglas County,*
  No. 6:19-cv-00904 (D. Or. 2020) ................................................24

*Melendres v. Arpaio,*
  989 F. Supp. 2d 822 (D. Ariz. 2013), *aff'd in part, vacated in part,*
  784 F.3d 1254 (9th Cir. 2015) .....................................................23

*Miranda-Olivares v. Clackamas County,*
  No. 3:12-cv-02317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) .........24

*Ng Fung Ho v. White,*
  259 U.S. 276 (1922) ................................................................ 5, 17

*Padilla v. Kentucky,*
  559 U.S. 356 (2010) .....................................................................17

*Rios-Diaz v. Butler,*
  No. 2:13-cv-00077 (D. Mont. Apr. 3, 2015) ...............................24

*Rita v. United States,*
  551 U.S. 338 (2007) .......................................................................7

*Sessions v. Dimaya,*
  138 S. Ct. 1204 (2018) ...................................................................17

*United States v. Machic-Xiap,*
  No. 3:19-cr-407, 2021 WL 3362738 (D. Or. Aug. 3 2021) ........................ 5, 26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ................................................................ 6, 12

*Washington v. Davis,*
  426 U.S. 229 (1976) .....................................................................6

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1886) ................................................................ 12-13

**Statutes & Other Authorities:**

U.S. Const., Amend. IV ....................................................................23

U.S. Const., Amend. V ............................................................. 4, 6, 28

U.S. Const., Amend. XIV .................................................................23

8 U.S.C. § 1231(b)(3) ....................................................................17

8 U.S.C. § 1325 ...........................................................................2

8 U.S.C. § 1326 ................................................................... *passim*

8 U.S.C. § 1326(a) ........................................................................9

8 U.S.C. § 1326(b) ........................................................................9

8 U.S.C. § 1357(g) .......................................................... 22, 23, 25, 26

18 U.S.C. § 3553(a) .................................................................... 6-7

18 U.S.C. § 3553(a)(1)-(7) ................................................................7

18 U.S.C. § 3553(a)(2) ................................................................. 6-7

18 U.S.C. § 3561(a)(1) ....................................................................9

18 U.S.C. § 3561(a)(2) ....................................................................9

28 C.F.R. § 540.41 .......................................................................14

28 C.F.R. § 540.51(f) ................................................................ 14-15

Aarti Kholi, Peter L. Markowitz, Lisa Chavez, *Secure Communities by the Numbers: An Analysis of Demographics and Due Process*, The Chief Justice Earl Warren Inst. on Law and Social Pol'y, Univ. of California, Berkeley Law School Research Report (Oct. 2011) ...................................................25

Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594 (Mar. 2016) ............................................23

Cecilia Menjívar, *The Racialization of "Illegality,"* Am. Acad. of Arts & Sci. (2021)....................................................20

Debbie Cenziper, Madison Muller, Monique Beals, Rebecca Holland, Andrew Ba Tran, *Under Trump, ICE aggressively recruited sheriffs as partners to question and detain undocumented immigrants, Washington Post*, Nov. 23, 2021 ..........26

Dep't of Homeland Security, U.S. Immigration and Customs Enforcement, *Budget Overview Fiscal Year 2022* ...................................................21

Dep't of Justice, Prosecuting Immigration Crimes Report, 8 USC 1326 Defendants Charged Fiscal Year 2022 ...................................................10

Deroy Murdock, *Fugitive Cities Have Harbored 10,000 Criminal-Alien Recidivists*, National Review, Mar. 9, 2018 ........................................19

Emma Kaufman, *Segregation by Citizenship,* 132 Harv. L. Rev. 1379 (2019)........................................................ 13, 16

Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017)...................................21

Fed. R. App. P. 29 ....................................................1

Hiroshi Motomura, *The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line*, 58 UCLA L. Rev. 1819 (Aug. 2011)........................................... 21, 22

Immigration Legal Resource Center, *Life Under PEP-COMM* (Oct. 2016)...........21

Indefensible: A Decade of Mass Incarceration of Migrants Prosecuted for Crossing the Border (2016) ....................................................2

Ingrid V. Eagly, *Prosecuting Immigration*, 104 Nw. Univ. L. Rev. 1281 (2010)........................................... 14-15

Joe Hagan, *The Long, Lawless Ride of Sheriff Joe Arpaio*, Rolling Stone, Aug. 2, 2012 ....................................................23

iv

Katie R. Quandt & Alexi Jones, *Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health*, Prison Policy Initiative (May 13, 2021) ............................................................................. 14-15

Leisy Abrego *et al., Making Immigrants into Criminals: Legal Processes of Criminalization in the Post-IIRIRA Era*, 5 J. on Migration & Hum. Security (2017)..................................................................................20

Maxine Bernstein, *Oregon sheriff violated federal law by holding woman in jail solely on immigration detainer, suit alleges*, The Oregonian, June 11, 2019......24

Mem. from Att'y Gen. to All Fed. Prosecutors, *Renewed Commitment to Criminal Immigration Enforcement* (April 11, 2017)..........................................19

Memorandum from Jeh Johnson, Sec'y, U.S. Dep't of Homeland Sec., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, Nov. 20, 2014 ................................................................................18

Migration Policy Institute, *Profile of the Unauthorized Population: Arizona* ........27

Migration Policy Institute, *Profile of the Unauthorized Population: California* ....27

Migration Policy Institute, *Profile of the Unauthorized Population: New Mexico*..................................................................................27

Migration Policy Institute, *Profile of the Unauthorized Population: Texas* ..........27

Migration Policy Institute, *Profile of the Unauthorized Population: United States*....................................................................................27

President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014).............................................................18

Robert S. Warshaw, *Thirty-First Report of the Independent Monitor for the Maricopa County Sheriff's Office, Melendres v. Arpaio*, Case No. 2:07-cv-02513, ECF No. 2780 ................................................................24

Savanna Strott, *Chance encounter with law enforcement is nearly life-altering in last Nevada jurisdiction overtly partnering with ICE*, Nevada Independent, Jan. 10, 2021 ..................................................................................25

Transcript, *Immigration Newsmaker:* A Conversation with ICE Deputy Director Tom Homan, June 5, 2018 .......................................................... 19-20

U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, Ch. 5 (9/12/2006) ............................................. 13-14

U.S. Dep't of Just., Fed. Bureau of Prisons, *Program Statement No. 5510.15 Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities* (2013)........................................................................................................15

U.S. Gov't Accountability Office, GAO-18-433, *Criminal Alien Statistics: Information on Incarcerations, Arrests, Convictions, Costs, and Removals* (July 2018) ............................................................................................19

U.S. Immigration and Customs Enforcement, *Criminal Apprehension Program*, https://www.ice.gov/identify-and-arrest/criminal-apprehension-program ..........22

U.S. Immigration and Customs Enforcement, *News Release: Secure Communities* ....................................................................................25

U.S. Sentencing Guidelines Manual § 1B1.1(a)(2) ...................................7

U.S. Sentencing Guidelines Manual § 1B1.1(a)(6) ...................................7

U.S. Sentencing Guidelines Manual § 1B1.1(a)(7) ...................................7

U.S. Sentencing Guidelines Manual § 2D1.1(a)(1) ...................................8

U.S. Sentencing Guidelines Manual § 2D1.1(c)(14) ...................................8

U.S. Sentencing Guidelines Manual § 2L1.2...............................................*passim*

U.S. Sentencing Guidelines Manual § 5B1.1 ...................................... 8-9

U.S. Sentencing Guidelines Manual Ch. 5 Pt. A ...............................7, 9

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

**Advocates for Basic Legal Equality, Inc.** (ABLE) is a 501(c)(3) non-profit law firm with offices in Toledo, Dayton, and Defiance, Ohio. ABLE attorneys and advocates represent low-income immigrants, including farmworkers, in immigration, civil rights, employment, and employment discrimination cases throughout Ohio. ABLE's mission is to provide high-quality legal assistance in civil matters to help eligible low-income individuals and groups achieve self-reliance, equal justice, and economic opportunity. ABLE represents immigrants in a wide variety of immigration law cases and immigrant civil rights actions for discriminatory treatment. The organization thus has a strong interest in opposing the erosion of protections for immigrants, especially discriminatory actions.

**Justice Strategies**, a small non-profit policy research organization, began work in the late 1990s when the U.S. Bureau of Prisons first announced its "Criminal Alien Requirements" contracting initiative, a program which resulted in construction of more than a dozen privately owned and operated segregated immigrant prisons. Justice Strategies published a number of articles and reports that documented the seriously substandard conditions of confinement in these

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, *amici* affirm that no counsel for a party authored this brief in whole or in part and no person other than *amici* and their counsel made a monetary contribution to the preparation or submission of this brief. All parties have consented to the filing of this brief.

prisons before conducting a major research project on federal prosecution policies and practices under 8 U.S.C. §§ 1325 and 1326. In 2016, Justice Strategies published Indefensible: A Decade of Mass Incarceration of Migrants Prosecuted for Crossing the Border – available at https://www.justicestrategies.org/publications/2016/indefensible-decade-mass-incarceration-migrants-prosecuted-crossing-border.

**LatinoJustice PRLDEF**, founded in 1972 as the Puerto Rican Legal Defense and Education Fund, is a national not-for-profit civil rights organization that advocates for and defends the constitutional rights of Latinos under the law. LatinoJustice has challenged discriminatory policies and practices in the areas of criminal justice and immigrant rights by suing police departments, correctional institutions, and federal law enforcement agencies, including the Department of Homeland Security and Immigration & Customs Enforcement. During its fifty-year history, LatinoJustice has also brought impact litigation to address discrimination against Latinos in education, employment, fair housing, language rights, redistricting, and voting rights.

**The Legal Aid Justice Center** (LAJC) is a Virginia-based nonprofit organization that provides legal and advocacy services to low-income communities. Through its Immigrant Advocacy Program, LAJC represents immigrants in their efforts to access justice, promotes systemic reforms to reduce

the abuse and exploitation of immigrants, and advocates for state and local policies that promote immigrants' wellbeing and prevent aggressive immigration enforcement. LAJC defends Virginia immigrants in removal proceedings, especially those who are arrested or detained by Immigration and Customs Enforcement by virtue of prior contact with the criminal justice system.

**The Massachusetts Law Reform Institute** (MLRI) is a statewide non-profit law and poverty center and a principal support center for Massachusetts civil legal aid agencies. Its mission is to advance economic, social, and racial justice for low-income persons and communities. For over fifty years, MLRI has engaged in legislative, administrative, and judicial advocacy on national, state, and local issues that affect these communities. Addressing public and institutional policies and procedures that either contribute to, or perpetuate, the cycle of poverty, and advancing racial equity, are two of the three fundamental frameworks guiding MLRI's mission. MLRI has participated in amicus briefs on issues affecting immigrants of color, such as *Commonwealth v. Hilaire,* 437 Mass. 809 (2002), (educating the court about the importance of oral immigration warnings for Creole-language speakers and those with limited literacy skills) and has engaged in advocacy to reform sentencing disparities that disproportionately harm Latino immigrants and state criminal records policies that increase poverty among and prevent equal access to wealth for people of color.

**The National Immigration Law Center** (NILC) is a national organization exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families. Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and has advanced policies that reinforce the nation's values of equality, opportunity, and justice. NILC focuses on issues that affect the well-being and economic security of immigrant communities: discriminatory enforcement practices, health care and safety net programs, education and training, workers' rights, and other federal and state policies affecting immigrants.

## SUMMARY OF ARGUMENT

Facially neutral laws violate the Fifth Amendment's equal protection guarantee when they are enacted with an invidious discriminatory purpose. The existence of racially disparate impact is probative of whether such impermissibly discriminatory purpose exists. Here, data from the U.S. Sentencing Commission reveal that 8 U.S.C. § 1326 disparately—indeed virtually exclusively—harms Latinos.

While Appellant establishes Section 1326's discriminatory purpose and effect, expert analysis of Sentencing Commission data presented in another court

further demonstrates the statute's disparate harms.[2] Specifically, these data show that almost all individuals convicted under Section 1326 are Latino. They also show that this nearly-entirely Latino population is almost invariably sentenced to incarceration. Individuals convicted of Section 1326 are more likely to receive incarceration than other offenders, even when controlling for statutory minimums, offense severity, and criminal history. Moreover, Section 1326 is a substantial reason why Latinos are more likely overall to be sentenced to federal incarceration than white individuals.

This racially disparate punishment is exacerbated in two ways. First, people incarcerated for Section 1326 offenses are likely to face harsher circumstances during their prison sentences. Second, these individuals are subject to post-sentencing removal, which can result "in the loss of . . . all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). The disparate rate at which Latinos are subjected to Section 1326 prosecutions is not coincidental or a mere feature of geography. Rather, the racist legacy of laws like Section 1326 promulgates a narrative that being Latino is in and of itself suspicious and fosters racial profiling by local law enforcement against Latinos. And the more recent

---

[2] Decl. of Michael Light at 2, *United States v. Machic-Xiap*, No. 3:19-cr-407 (D. Or. Mar. 31, 2021), ECF No. 52-1.

phenomenon of targeting "criminal aliens" provides another tool for this discrimination.

## ARGUMENT

Facially neutral laws, like Section 1326, run afoul of the Fifth Amendment's equal protection guarantee when they are enacted with an invidious discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977). Determining whether such purpose was a "motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* One important starting point for this inquiry is whether the official action "bears more heavily on one race than another." *Id*. (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Here, data from the U.S. Sentencing Commission reveal that Section 1326 disparately—indeed virtually exclusively—harms Latinos.

## A.    Neither Federal Law nor the Sentencing Guidelines Require Incarceration for Section 1326 Convictions.

At sentencing, a district court is tasked with imposing "a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C.

§§ 3553(a), (a)(2). The sentencing court is further tasked with ensuring that its selected sentence considers, among other things, "the nature and circumstances of the offense[,] the history and characteristics of the defendant . . . [and] the need to avoid sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* §§ 3553(a)(1)-(7).

In imposing a sentence, the court is required to consider the sentencing range provided by the Sentencing Guidelines as the "starting point and the initial benchmark" of a sentencing proceeding. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Sentencing Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007).

To do this, the Guidelines attempt to identify the severity of a conviction's nature and circumstances by requiring the calculation of a final offense level. The offense level calculation begins by determining a base offense level for the corresponding offense(s) of conviction, which is then adjusted, including based upon specific offense characteristics. U.S. Sentencing Guidelines Manual §1B1.1(a)(2) (U.S. Sentencing Comm'n 2021). The final offense level is then paired with a criminal history score to identify the recommended sentencing range on the Guidelines sentencing matrix. *Id.* §§1B1.1(a)(6)-(7); *see also id.* § 5 Pt. A (sentencing matrix).

Section 2L1.2 of the Sentencing Guidelines, "Unlawfully Entering or Remaining in the United States," identifies offense levels for violating section 1326.[3] U.S. Sentencing Guidelines Manual § 2L1.2. Section 2L1.2 begins all calculations with a base offense level of 8, and then provides for various increases based upon the existence, nature, and timing of any prior convictions. Assuming credit for acceptance of responsibility, a single conviction for violating Section 1326 can result in a final offense level as low as 6, and no higher than 29, a relatively low minimum and maximum offense level for a 43-level matrix.[4] *Compare, e.g., id.* § 2L1.2 *with id.* § 2D1.1(a)(1), (c)(14) (setting as 12 lowest base offense level for most controlled substance trafficking and 43 as highest).

The Guidelines acknowledge that a substantial number of offense-and-offender combinations can warrant non-carceral sentences—providing for zones in which an entirely non-carceral sentence may be consistent with the Guidelines. *See*

---

[3] Sentences pursuant to Section 1326 make up 99.2% of § 2L1.2 cases. While § 2L1.2 also applies to other offenses, between 2015 and 2019, 99.2 percent of people sentenced pursuant to that section were sentenced for violating section 1326. *Id.* at 2.

[4] Professor Light analyzed data that included the time both preceding and following the Sentencing Commission amending § 2L1.2. *See* Decl. of Michael Light, *supra* note 2, U.S. Sentencing Guidelines Manual Supp. to Appx. C, pp. 140-44, 187-89 (U.S. Sentencing Comm'n 2021) (amending § 2L1.2 in 2016 and 2018). The amended guideline provides less severe enhancements for certain pre-removal criminal history events, while adding enhancements for certain post-removal criminal history events. *Id.* at 146.

8

*id.* § 5B1.1 (describing circumstances in which a probationary sentence is authorized). Most any person convicted of reentry without prior criminal history is likely to fall into a non-carceral-inclusive zone.[5]

In any event, given the advisory nature of the Guidelines, all Section 1326 offenses are statutorily eligible for non-carceral sentences because Section 1326 does not mandate incarceration. *Accord generally* 8 U.S.C. § 1326(a)-(b) (providing sentencing ranges without minimums and at-most 20 years' imprisonment) *with* 18 U.S.C. § 3561(a)(1)-(2) (foreclosing probation for felonies with maximum possible imprisonment terms of 25 or more years and where statutes expressly bar probation).

**B.    Individuals Convicted of Violating Section 1326 are Almost Exclusively Latino and are more likely to be Sentenced to a Term of Incarceration than Similarly Situated Individuals.**

For another district court case, Professor Michael T. Light analyzed the Sentencing Commission's 2015-2019 data and uncovered evidence of Section 1326's disparate impact.[6] Analysis of these data resulted in two major findings:

---

[5] All offense level increases under § 2L1.2 are based upon an individual having prior criminal convictions. A person without criminal history would thus have a final offense level 6 or 8, depending upon whether they received credit for acceptance of responsibility. A final offense level of 6 and 8 both fall within a probation-inclusive zone for a person without criminal history points. *See* U.S. Sentencing Guidelines Manual Ch. 5 Pt. A.

[6] Decl. of Michael Light, *supra* note 2.

Latinos are disproportionately likely to be the subject of a Section 1326 sentencing, and Section 1326 offenses are disproportionately likely to be sentenced to imprisonment.

Latinos accounted for **99 percent** of the nearly-88,000 people sentenced pursuant to § 2L1.2 between 2015 and 2019, creating a near-certainty that convictions pursuant to Section 1326 are convictions of Latinos.[7] The Government's statistics further bear out this disparate rate; in the most recently completed fiscal year, 98 percent of the people charged with violating Section 1326 whose nationalities were known were nationals of Mexico, Central or South America, or Spanish-speaking Caribbean nations.[8]

In turn, the sentencing data show that **97 percent** of § 2L1.2 sentences included incarceration.[9] This 97-percent imprisonment rate places § 2L1.2 as more likely to receive carceral sentences than all but three of the ten most frequently

---

[7] *Id.* at 2-3.

[8] *See* Dep't of Justice, Prosecuting Immigration Crimes Report, 8 USC 1326 Defendants Charged Fiscal Year 2022, https://www.justice.gov/usao/page/file/1460661/download (last visited Feb. 23, 2023) (identifying 13,158 people as nationals of Mexico, Central or South America, or Spanish-speaking Caribbean nations among 13,670 total so-charged with an additional 269 of "unknown" nationality). Even including the people of unknown nationalities in the overall total, nationals of Mexico, Central or South America, or Spanish-speaking Caribbean nations still accounted for 96 percent of charged individuals. *See id.*

[9] Decl. of Michael Light, *supra* note 2 at 4-5.

applied Guideline sections.[10] Or, put another way, this almost-exclusively-Latino group is nearly certain to be sentenced to a term of incarceration.[11]

The overwhelming likelihood of a carceral sentence cannot be explained away by the specifics of the people sentenced pursuant to § 2L1.2; adjusting for statutory minimums, offense severity, and criminal history scores, the disparate incarceration rate is only worse. Specifically, when controlling for offenders of equal offense and criminal history scores, a person sentenced pursuant to § 2L1.2 is more likely to be sentenced to incarceration than all but one of the most commonly used sentencing guidelines.[12] In fact, the likelihood of incarceration is between six and over-30 percent higher for a person sentenced under § 2L1.2 than for a similarly situated individual sentenced under eight of the other most commonly applied Guidelines.[13]

The disparate sentencing outcomes of § 2L1.2 offenses contribute significantly to the disproportionate likelihood of incarceration between white and Latino offenders in federal sentencings. Controlling for any statutory mandatory

---

[10] *Id.*

[11] In total, Professor Light's assessment entailed 87,841sentencings. *Id.* at 2. At 99 percent Latino and 97 percent receiving incarceration, Section 1326 resulted in incarcerating no fewer than 84,353 Latino people over a five-year period.

[12] *Id.* at 7-8.

[13] *Id.* at 8.

minimums as well as offender and offense level scores, Latinos have a 13.5-percent greater likelihood of receiving a sentence of incarceration than similarly situated white individuals.[14] However, when § 2L1.2 cases are factored out, the relative incarceration gap between white and Latino offenders decreases substantially, down to an 8-percentage-point gap.[15] "In other words, adjusting for the punitive sanctions 2L1.2 offenders receive decreases the amount of Hispanic-white disparity in federal sentences by roughly 40 percent . . . ."[16] Section 1326's harms thus include serving as a substantial driver of the disparate rate at which Latinos are incarcerated generally.

The Section 1326 data thus demonstrate several stark racialized patterns: 99 percent of those convicted are Latino, despite the statute being implicated for any person returning without authorization, and 97 percent of those convicted are incarcerated despite the absence of a mandatory minimum and with neither offense level nor criminal history score appearing to be the cause. In other circumstances, such a "stark pattern" as demonstrated in Section 1326 convictions and sentencings has rendered the "impact alone determinative" of a finding of discriminatory intent. *Arlington Heights*, 429 U.S. at 266. (citing *Yick Wo v. Hopkins*, 118 U.S.

---

[14] *Id.* at 8-9.

[15] *Id.*

[16] *Id.* at 8.

356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)).

## C.    The Disproportionate Conviction of Latinos Under Section 1326 Leads to Extremely Punitive Results.

The harms of the disparate conviction and sentencing rate for Latinos is compounded because individuals convicted under Section 1326 receive disproportionately harsh sentences. First, individuals convicted under Section 1326 are necessarily noncitizens and are thus more likely to be either functionally ineligible for minimum-security incarceration than other similarly situated persons, or sent to designated all-foreign prisons that have been described as "an emergent penology in which noncitizens are punished differently than citizens of the United States."[17] Second, the nature of the underlying offense virtually guarantees that this disproportionately Latino population will be subject to removal.

Individuals convicted under Section 1326 are more likely to receive a disproportionately punitive term of incarceration because the Bureau of Prisons (BOP) treats being a noncitizen as a public safety factor in classifying a prisoner's

---

[17] Emma Kaufman, *Segregation by Citizenship,* 132 Harv. L. Rev. 1379, 1408 (2019)

security status.[18] As a result, noncitizens convicted under Section 1326 have a

higher security classification than would a citizen convicted of a comparable

offense, resulting in lessened likelihood to serve his or her sentence in a minimum-

security facility. Moreover, this higher security classification is "applied without a

finding of dangerousness or risk of flight and despite the fact that studies have

suggested that deportable [noncitizens] do not have higher recidivism rates."[19]

Higher security classifications impose greater restrictions on noncitizens

convicted under Section 1326, including more restrictive visitation from children,

parents, spouses, and other relatives.[20] This kind of separation and detachment

from families and other social networks has serious detrimental effects on mental

wellbeing.[21] In addition, persons incarcerated in medium or high-security

institutions are faced with highly invasive body cavity searches before and after

---

[18] U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification,* Ch. 5, at 9 (Sep. 12, 2006), *available at* http://www.bop.gov/policy/progstat/5100_008.pdf.

[19] Ingrid V. Eagly, *Prosecuting Immigration*, 104 Nw. Univ. L. Rev. 1281, 1318 (2010) (footnotes omitted).

[20] *See, e.g.*, 28 C.F.R. § 540.41 (noting that only persons incarcerated at minimum- or low-security institutions are eligible for visitation outside the institution's security perimeter).

[21] *E.g.* Katie R. Quandt & Alexi Jones, *Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health*, Prison Policy Initiative (May 13, 2021), https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

visits, and their visitors may also be subject to invasive searches.[22] The realities of

modern prisons—including federal penitentiaries, which suffer from issues such as

overcrowding, solitary confinement, and routine exposure to violence—have

further negative effects on mental wellbeing.[23]

Noncitizens subject to removal "may be rendered ineligible to participate in

prison programming, which can include paid work, educational courses,

occupational training, and drug abuse treatment."[24] That ineligibility becomes

doubly problematic; "[g]iven that successful completion of certain programs can

make inmates eligible for earlier release, bars on participation have the practical

result of lengthening the sentences of noncitizens."[25] Relatedly, being a noncitizen

subject to removal, an inevitability in all Section 1326 convictions, "can also

render [the individual] ineligible for the program option of serving the last six

months of one's sentence in a community corrections setting."[26]

---

[22] *See* 28 CFR § 540.51(f); U.S. Dep't of Just., Fed. Bureau of Prisons, *Program Statement No. 5510.15 Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities* 6-18 (2013), https://www.bop.gov/policy/progstat/5510_015.pdf.

[23] *See* Quandt & Jones, *supra* note 21.

[24] Eagly, *supra* note 19 at 1319.

[25] *Id*.

[26] *Id*.

The carceral realities of the all-foreign prisons are similarly bleak. Approximately half of the noncitizens in federal prisons are serving time in all-foreign prisons, and about 87% of those individuals were born in Spanish-speaking countries.[27] Emergent information about these prisons reveals they are "institutions with unusually poor healthcare; overcrowding; higher rates of solitary confinement, lockdowns, and deaths in custody than comparable BOP institutions; and a dearth of rehabilitative programs such as drug treatment and education courses, which are offered in other federal prisons."[28] Additionally, there is evidence that these facilities "lack law libraries, training and educational programs, and recreational equipment,"[29] have reduced technological contact with the outside world,[30] and have an increased likelihood that prisoners will be more geographically inaccessible from their families and loved ones in the United States.[31]

The punitive aspects of conviction under Section 1326 go beyond the four walls of incarceration; the harsh reality is a strong probability of removal from the

---

[27] Emma Kaufman, *Segregation by Citizenship,* 132 Harv. L. Rev. 1379, 1403, 1405 (2019).

[28] *Id.* at 1409.

[29] *Id.*

[30] *See id.* (noting that "no all-foreign prison offers access to TRULINCS, an email system that exists in all other federal prisons.)

[31] *See id.* at 1411-12.

country as well as family, property, and any semblance of security. Removal of an

individual from his or her family—parents, spouses, siblings, and even children—

is a permanent separation.[32] Federal laws like Section 1326 make deportation "an

integral part—indeed, sometimes the most important part—of the penalty that may

be imposed on noncitizen defendants." *Padilla v. Kentucky*, 559 U.S. 356, 364

(2010) (footnote omitted). For this reason, the Court has repeatedly recognized,

"deportation is always a particularly severe penalty," *Lee v. United States*, 137 S.

Ct. 1958, 1968 (2017); *Padilla*, 559 U.S. at 365; *Fong Yue Ting v. United States*,

149 U.S. 698, 740 (1893), which can result "in loss of both property and life . . . ."

*Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). As such, it "may be of greater

concern to a convicted [noncitizen] than any potential jail sentence." *Sessions v.

Dimaya*, 138 S. Ct. 1204, 1213 (2018) (internal quotation omitted)).

Accordingly, prosecutions and convictions under Section 1326 not only

disparately target Latinos, but they also subsequently result in disproportionately

carceral sentences despite the heightened severity of during- and post-incarceration

sentencing.

---

[32] For those individuals who do not face removal, often due to withholding of removal under 8 U.S.C. § 1231(b)(3), the aforementioned combination of a disproportionate rate of incarceration with a dearth of available programs during custody means that people return to their communities having had all of the detriments of incarceration and few, if any, services.

**D.      Section 1326 Reinforces Stereotypes of Latinos as Criminals**

**1.      Those Convicted Under Section 1326 are Designated as "Criminal Aliens" and Falsely Portrayed as Dangerous**

In 2014, the Department of Homeland Security issued a memorandum reflecting "new policies for the apprehension, detention, and removal of aliens in this country."[33] Among those noncitizens who were prioritized for removal under the Priorities Memo were "aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status."[34] When the memo was released, the government encouraged the use of the term "criminal alien" to describe people who were subject to removal when convicted of a crime, and described them as "felons," "criminals," and "gang members."[35]

In 2018 the Government Accountability Office issued a report on "Criminal Alien Statistics," emphasizing that "Members of the alien population that have been arrested and convicted of crimes in the United States are referred to as

---

[33] Memorandum from Jeh Johnson, Sec'y, U.S. Dep't of Homeland Sec., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf [hereinafter Priorities Memo].

[34] *Id.* at 3.

[35] *See* President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/11/20/remarks-President-address-nation-immigration.

criminal aliens."[36] And media outlets use the term "criminal alien" to emphasize danger; one outlet argued that sanctuary city laws, for example, "protect foreign lawbreakers, often with dangerous and deadly results for law-abiding American citizens."[37] Subsequent to the Priorities Memo, the Office of the Attorney General emphasized increased prosecutions under the statute, ordering that "Each District shall consider prosecution of 8 U.S.C. § 1326 for each illegal reentrant."[38]

Because Section 1326 is a federal felony, those convicted under it are considered a top priority for removal under the Priorities Memo and have been demonized through rhetoric suggesting they present danger to the community. For example, in 2018, Immigration and Customs Enforcement Deputy Director Tom Homan told an interviewer that "Number one, when you release a criminal alien

---

[36] U.S. Gov't Accountability Office, GAO-18-433, *Criminal Alien Statistics: Information on Incarcerations, Arrests, Convictions, Costs, and Removals* (July 2018) [hereinafter "GAO Report"] https://www.gao.gov/assets/gao-18-433.pdf.

[37] Deroy Murdock, *Fugitive Cities Have Harbored 10,000 Criminal-Alien Recidivists*, National Review, (Mar. 9, 2018), https://www.nationalreview.com/2018/03/fugitive-cities-have-harbored-10000-criminal-alien-recidivists/.

[38] Mem. from Att'y Gen. to All Fed. Prosecutors, *Renewed Commitment to Criminal Immigration Enforcement,* (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

from a jail, that criminal alien is going to return to his community and victimize the very communities in which he lives."[39]

The majority of those designated as "criminal aliens" on the basis of a federal conviction were convicted of illegal reentry. In Fiscal Year 2016, 66% were convicted of immigration offenses, and 91% of these were convicted of illegal reentry.[40] Thus most of those demonized by the charged rhetoric of being called "criminal aliens" for a federal conviction were guilty of nothing more than seeking a better life twice.

### 2. Local Law Enforcement Relies on the "Criminal Alien" Designation to Racially Profile Latinos

These "processes of lawmaking and enforcement practices [that] produce the notion of 'criminal aliens,'" create rhetorical frameworks that encourage targeting of Latinos.[41] Undocumented legal status has been increasingly used as a proxy for race,[42] and this, combined with the designation of those who are convicted under

---

[39] Transcript, *Immigration Newsmaker:* A Conversation with ICE Deputy Director Tom Homan, (June 5, 2018), https://cis.org/Transcript/Immigration-Newsmaker-Conversation-ICE-Deputy-Director-Tom-Homan.

[40] GAO Report at 84.

[41] Leisy Abrego *et al.*, *Making Immigrants into Criminals: Legal Processes of Criminalization in the Post-IIRIRA Era*, 5 J. on Migration & Hum. Security 694, 706-08 (2017), https://journals.sagepub.com/doi/pdf/10.1177/233150241700500308.

[42] Cecilia Menjívar, *The Racialization of "Illegality,"* Am. Acad. of Arts & Sci. (2021).

Section 1326 as "criminal aliens," has incentivized racial profiling by local law enforcement.

Recent decades have seen a "dramatic expansion of the state and local role in bringing removable noncitizens into contact with federal enforcement."[43] This expansion included the "Secure Communities" program, under which biometric data for those arrested by local law enforcement are shared with the Department of Homeland Security to determine if someone is subject to deportation, [44] and the

---

[43] Hiroshi Motomura, *The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line*, 58 UCLA L. Rev. 1819, 1858 (Aug. 2011).

[44] *See* Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017). Under the Obama administration, Secure Communities was replaced with the "Priority Enforcement Program," or "PEP-COMM," under which FBI continued "sharing fingerprints with the Department of Homeland Security so that ICE can still detect immigrants in local and state law enforcement custody," though with different priorities than under the original Secure Communities initiative. Immigration Legal Resource Center, *Life Under PEP-COMM*, (Oct. 2016), https://www.ilrc.org/life-under-pep-comm. While the executive order establishing Secure Communities was rescinded by President Obama, the program is still operational, though it was last described by the name "Secure Communities" in the Fiscal Year 2022 budget. *See* Dep't of Homeland Security, U.S. Immigration and Customs Enforcement, *Budget Overview Fiscal Year 2022*, at 140 (Describing current use of Secure Communities), https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf. It is now identified as the "Criminal Apprehension Program" and appears under that name in the Fiscal Year 2023 budget. *See* Dep't of Homeland Security, *Budget In Brief 2023*, at 101, https://www.dhs.gov/sites/default/files/2022-03/22-%201835%20-%20FY%202023%20Budget%20in%20Brief%20FINAL%20with%20Cover_Remediated.pdf.

287(g) program, under which local sheriff's offices are granted the power to enforce some aspects of federal immigration law.[45] The Department of Homeland Security has continually promoted the use of local law enforcement, and emphasized the alleged dangerousness of those prosecuted as "criminal aliens" through this cooperation. ICE itself commends those local law enforcement agencies who "cooperate with ICE's detainers and work closely with the agency to ensure the safety of local communities."[46]

These programs create a framework where local law enforcement becomes the first point of contact for those eventually convicted of federal immigration crimes. And because cases are quickly transferred to the federal system, "state and local officers can make arrests without regard to federal enforcement priorities, yet they are insulated from many of the tempering influences that prosecutors exert on arrest patterns when they decide not to bring criminal charges."[47] Moreover, federal reliance on the validity of local arrests "tends to mask local law

---

[45] *See* 8 U.S.C. § 1357(g).

[46] Immigration and Customs Enforcement, *Criminal Apprehension Program*, https://www.ice.gov/identify-and-arrest/criminal-apprehension-program.

[47] Motomura, *supra* note 43 at 1848.

enforcement agents' racial and ethnic preferences and prejudices (even as biases vary in severity from jurisdiction to jurisdiction)."[48]

Local agencies rely on the rhetoric of dangerousness associated with the "criminal alien" moniker to engage in racial profiling of Latinos. Most notably, Sheriff Joe Arpaio targeted the Latino population of Maricopa County both while his department had 287(g) authority and after it was revoked.[49] As the District of Arizona found in 2013, the Maricopa County Sheriff's Office "institutionalize[d] the systematic consideration of race as one factor among others in forming reasonable suspicion or probable cause in making law enforcement decisions," in violation of both the Fourth and the Fourteenth Amendments. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 898 (D. Ariz. 2013) *aff'd in part, vacated in part*, 784 F.3d 1254, 1260 (9th Cir. 2015) (affirming district court's finding that the Sheriff's Office's unconstitutional reliance on race "applied across-the-board to all [of its] law enforcement decisions"). The department has been overseen by a federal

---

[48] Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 650 (Mar. 2016).

[49] When bringing visitors to his Tent City Jail, Arpaio would ask, "Want to see the tent where all the Mexicans are?" and Latinos held there were subjected to racial slurs. Joe Hagan, *The Long, Lawless Ride of Sheriff Joe Arpaio*, Rolling Stone, (Aug. 2, 2012), https://www.rollingstone.com/culture/culture-news/the-long-lawless-ride-of-sheriff-joe-arpaio-231455/.

monitor for over a decade and is still not in compliance.[50] The monitor found that the most recent full-year report on stop data showed "disparate outcomes in traffic stop activity based on race and ethnicity over the course of the previous 12 months of data."[51]

Local law enforcement agencies have been regularly found to profile Latinos, often in concert with efforts to enforce immigration laws. The local jails in Oregon have improperly held people subject to release "based on immigration enforcement alone" even after the practice was found unconstitutional in 2014.[52] The Montana Highway Patrol agreed to being placed under monitorship in 2015 for targeting Latino drivers specifically to investigate their immigration status. *Rios-Diaz v. Butler*, No. 2:13-cv-00077, ECF No. 39 (D. Mont. Apr. 3, 2015). In

---

[50] *See* Robert S. Warshaw, *Thirty-First Report of the Independent Monitor for the Maricopa County Sheriff's Office, Melendres v. Arpaio*, Case No. 2:07-cv-02513, ECF No. 2848, available at https://www.mcso.org/home/showpublisheddocument/1298/638099613918170000.

[51] *Id.* at 58.

[52] Maxine Bernstein, *Oregon sheriff violated federal law by holding woman in jail solely on immigration detainer, suit alleges*, The Oregonian, June 11, 2019, https://www.oregonlive.com/crime/2019/06/douglas-county-sheriff-violated-federal-law-by-holding-woman-in-jail-solely-on-immigration-detainer-suit-alleges.html (referencing *Lopez-Flores v. Douglas County*, No. 6:19-cv-00904 (D. Or. 2020) and *Miranda-Olivares v. Clackamas County,* No. 3:12-cv-02317, (D. Or. 2014)).

Nye County, Nevada, which still operates a 287(g) program, Latinos are regularly swept into the immigration system after being stopped for minor offenses.[53]

### 3. Racial Profiling Encouraged by the "Criminal Alien" Designation Drives the Racial Disparity in Section 1326 Convictions.

In 2017, ICE boasted that 363,400 "criminal aliens" had been deported through Secure Communities since its founding in 2008.[54] Researchers found that 93% of those identified for deportation through Secure Communities were Latino, and found support for the claim that this results from local law enforcement agencies "targeting Latinos for minor violations and pre-textual arrests with the actual goal of initiating immigration checks through the Secure Communities system."[55] And 287(g) programs rely on the "criminal alien" designation to funnel individuals into federal criminal and immigration courts as well. A *Washington*

---

[53] Savanna Strott, *Chance encounter with law enforcement is nearly life-altering in last Nevada jurisdiction overtly partnering with ICE*, Nevada Independent, Jan. 10, 2021, https://thenevadaindependent.com/article/chance-encounter-with-law-enforcement-is-nearly-life-altering-in-last-nevada-jurisdiction-overtly-partnering-with-ice (detailing story of a man who had been granted asylum decades ago who was turned over to ICE by local law enforcement after being stopped for having a dog without a leash).

[54] U.S. Immigration and Customs Enforcement, *News Release: Secure Communities* (archived), https://www.ice.gov/secure-communities.

[55] Aarti Kholi, Peter L. Markowitz, Lisa Chavez, *Secure Communities by the Numbers: An Analysis of Demographics and Due Process*, The Chief Justice Earl Warren Inst. on Law and Social Pol'y, Univ. of California, Berkeley Law School Research Report 1, 6 (Oct. 2011) https://www.law.berkeley.edu/files/Secure_Communities_by_the_Numbers.pdf.

*Post* study from 2021 showed that from 2016 through 2019, arrest rates for sheriffs' departments rose beginning in 2016, and increased particularly in agencies participating in the 287(g) program.[56] And it found that "about one-third of the 1,751 immigrants detained in Frederick County under 287(g) were arrested for lower-level offenses, including traffic violations and misdemeanors." *Id.*

The government has argued, in litigating claims regarding Section 1326, that this disparity results from the proximity of Mexico to the United States, but as the District of Oregon correctly held in a related case, the fact that "an innocent explanation may exist for the disparity does not eliminate the disparity." *United States v. Machic-Xiap*, No. 3:19-cr-407, 2021 WL 3362738 at *11 (D. Or. Aug. 3, 2021).

But the disparity is far larger than mere geography would dictate. The overwhelming percentage of Latino defendants in Section 1326 prosecutions exceeds the demographic breakdown of the estimated undocumented population. The non-partisan Migration Policy Institute estimates that 75% of undocumented people in the United States were born in Mexico, Central America, or South

---

[56] Debbie Cenziper, Madison Muller, Monique Beals, Rebecca Holland, Andrew Ba Tran, *Under Trump, ICE aggressively recruited sheriffs as partners to question and detain undocumented immigrants*, *Washington Post*, (Nov. 23, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-ice-sheriffs-immigrants-287g/.

America.[57] Narrowing the focus to the southern border likewise does not explain the disparity; the Migration Policy Institute estimates that people born in Mexico, Central America, or South America account for: 79% of the undocumented population in California,[58] 86% of the undocumented population in Arizona,[59] 90% of the undocumented population in New Mexico,[60] and 88% of the undocumented population in Texas.[61] Thus, while Latinos and Latinas make up a majority of the undocumented population nationally and in the southern border states, they do not approach the 99% figure seen in prosecutions of Section 1326.

Instead, the extreme proportion of Latinos among those prosecuted under Section 1326 flows from the process outlined above. By creating a designation of "criminal alien"—many of whom are people who have been convicted under

---

[57] Migration Policy Institute, *Profile of the Unauthorized Population: United States*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

[58] *See* Migration Policy Institute, *Profile of the Unauthorized Population: California*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/CA.

[59] *See* Migration Policy Institute, *Profile of the Unauthorized Population: Arizona*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AZ.

[60] *See* Migration Policy Institute, *Profile of the Unauthorized Population: New Mexico*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NM.

[61] Migration Policy Institute, *Profile of the Unauthorized Population: Texas*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX.

1326—the federal government arms local law enforcement with tools that are used to target Latinos disproportionately, creating wildly disparate rates of conviction by race.

## CONCLUSION

The documented disparate harms that Section 1326 inflicts upon Latinos, combined with the racist and unaddressed intentions of Section 1326 more than suffice to render the statute violative of the Fifth Amendment's equal protection guarantee. *Amici* urge this Court to reverse the district court's erroneous ruling to the contrary.

Dated:  February 21, 2023                    Respectfully submitted,

/s/ Max S. Wolson                            LatinoJustice PRLDEF
Max S. Wolson                                Miranda Galindo
National Immigration Law Center              523 W. Colonial Drive
P.O. Box 34573                               Orlando, FL 32804
Washington, D.C. 20043                       (321) 250-2853
(202) 216-0261 • wolson@nilc.org             mgalindo@latinojustice.org

Nicholas David Espiritu
National Immigration Law Center
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
(213) 639-3900 • espiritu@nilc.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 5,756 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Times New Roman font.

Dated:  February 21, 2023           /s/ Max S. Wolson
                                       Max S. Wolson

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  February 21, 2023                    /s/ Max S. Wolson
                                             Max S. Wolson